NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251360-U

NOS. 4-25-1360, 4-25-1361, 4-25-1362 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 18, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.J., R.J., and J.J., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Livingston County |
| Petitioner-Appellee, | ) | Nos. 23JA47 |
| v. | ) | 23JA48 |
| Ashley S., | ) | 23JA49 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Mary E. Koll, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's determination that respondent was unfit was not against the manifest weight of the evidence.

¶ 2    In 2024, the State filed a petition seeking to terminate respondent Ashley S.'s parental rights as to her minor children B.J. (born in 2018), R.J. (born in 2020), and J.J. (born in 2022). The trial court found her to be unfit and that termination was in her children's best interest, so it granted the petition and terminated her rights. On appeal, she does not challenge the best-interest finding, but she argues that the finding of unfitness was against the manifest weight of the evidence. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4                                   A. Initial Proceedings

¶ 5        In November 2023, the State filed a petition for adjudication of wardship, alleging that the children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)) for numerous reasons pertaining to domestic violence, substance abuse, and mental health issues. Following the shelter-care hearing, the trial court granted temporary custody of the children to the Illinois Department of Children and Family Services (DCFS).

¶ 6        In March 2024, the trial court adjudicated the children to be neglected minors as defined by section 2-3(1)(b), reasoning that the "parents have a history of engaging in domestic violence preventing them from properly parenting." The children became wards of the court and remained in the custody of DCFS. A permanency goal was set to return the children home in 12 months. The court ordered DCFS to develop and implement a service plan to meet the permanency goal, and it ordered respondent to fully cooperate and complete that service plan. She was admonished that "failure to correct the conditions which required the child(ren) to be in care by completing the service plans, cooperating with any after-care plan, and complying with the terms of this order may cause them to risk loss of custody and/or termination of parental rights."

¶ 7        Thereafter, the trial court held permanency review hearings to track respondent's reasonable efforts to regain custody of the children. In August 2024, the court terminated parental visitation due to inappropriate comments made by the parents during the visits. In November 2024, respondent filed a "Motion to Revise Permanency Order" to allow further visitation, but the record does not show that visitation was reinstated.

¶ 8                                B. Petition for Termination

¶ 9        In December 2024, the State filed the petition to terminate parental rights, alleging that respondent

"is an unfit person to have a child in that:

\*\*\*

She has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare, pursuant to 750 ILCS 50/1(D)(b).

\*\*\*

She has failed to make reasonable efforts to correct the conditions that caused the minor to be removed during a nine (9) month period after an adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987, said dates being 3/18/2024 to 12/18/2024 and/or 3/31/2024 to 12/31/2024, pursuant to 750 ILCS 50/1(D)(m)(i).

\*\*\*

She has failed to make reasonable progress toward the return of the minor to her during a nine (9) month period after an adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987, said dates being 3/18/2024 to 12/18/2024 and/or 3/31/2024 to 12/31/2024, pursuant to 750 ILCS 50/1(D)(m)(ii)."

¶ 10 The petition also brought allegations of unfitness against the biological father, Rudy M.; he is not a party to this appeal, so we do not set forth here the facts pertaining to him.

¶ 11 C. Fitness Hearing

¶ 12 The fitness hearing commenced in October 2025. The State submitted the relevant service plans as People's Exhibits 1 through 4 without objection.

¶ 13 Markus Armstrong, a police sergeant with the Pontiac Police Department, testified that on June 27, 2024, he responded to a call of two people overdosing. When he arrived at the

scene, Rudy and respondent were present. Respondent's head was slumped between her legs and towards the floor with her nose "near her belly button." She had a weak pulse and was breathing slowly, slumping back over when moved, and responding slowly to questions. After administration of Narcan, she could speak better and indicated she was trying to get her children back and would not do drugs.

¶ 14    Sabrina Cavanaugh, a foster care supervisor at the Center for Youth and Family Solutions (CYFS), testified that she served as the caseworker or case supervisor for all three children in this matter from February 2024 through to the time of her testimony. The relevant goals outlined in the service plan during the nine-month periods included cooperation with the agency; communication with the agency; obtaining stable housing; maintaining a legal income to support her children; and completing a sex offender assessment, a substance abuse assessment, drug screenings, parenting classes, and a domestic violence assessment.

¶ 15    Cavanaugh testified that respondent's cooperation was "hit or miss" because there were "spurts where there was no communication." Respondent "went through a lot of phone numbers" and was difficult to reach, though this improved throughout the life of the case. She has not maintained a stable job or income throughout the case. She obtained an apartment she has shared with Rudy since November 2024. Prior to that, she and her children lived in various places, including with her mother and friends. Cavanaugh did not always know where respondent resided.

¶ 16    Furthermore, because respondent is a registered sex offender, she was asked to complete the sex offender evaluation. Respondent informed Cavanaugh that the incident leading to her registration as a sex offender happened when she was a minor, and she was going to challenge the registration requirement and the recommendation for an evaluation. Eventually, she

agreed to complete the evaluation, but she failed to show up at any of the three times scheduled to do so. As of the time of the fitness hearing, respondent still had not completed the assessment.

¶ 17    Respondent's assessment also recommended that she undergo substance abuse treatment. She repeatedly started and then was discharged from treatment for issues related to attendance. At one point, she requested a transfer to a different provider, but ultimately, she never completed the goal. Relatedly, she completed some of the weekly drug screens but missed most of them, despite CYFS providing gas cards and moving her testing location closer to her. For at least some of the nine-month periods, she did not have a valid driver's license. When she did complete tests, they came back with positive results for tetrahydrocannabinol (THC). Regarding the overdose incident, respondent told Cavanaugh she did not take the substances willingly.

¶ 18    Furthermore, respondent was initially referred to parenting classes in March 2024, but she was discharged from one program for attendance issues. She failed to start a program set up with a different provider. Ultimately, she completed the parenting course with yet another provider in March 2025.

¶ 19    Regarding domestic violence, respondent completed an assessment but did not complete the domestic violence course she was referred to in March 2024. She did not return the provider's communication until she was taken off the communication list and subsequently discharged from the course for breaching the confidentiality policy. She opted not to participate in a separate course and then began a course with yet a third program. Despite requests for an update, Cavanaugh had not received evidence that respondent completed the program.

¶ 20    Respondent completed a mental health assessment and was referred to treatment. She did not respond to calls, canceled or was otherwise absent from treatment sessions, and ultimately did not complete treatment. While she has not been found disabled, she informed

Cavanaugh that she is on medication and has hyperactivity issues. She was recommended to Moral Reconation Therapy (MRT).

¶ 21 Regarding respondent's parental visitation with her children, Cavanaugh attended the sessions or had a support worker supervise them from approximately February to November 2024. She testified that while respondent engaged with her children, she was not always appropriate with them, including by talking disparagingly about DCFS in front of them. The trial court ultimately stopped the parental visits in August 2024 in the best interest of the children because of these issues. Respondent has not otherwise expressed to Cavanaugh an interest in her children's lives or an interest in providing gifts or cards for them during birthdays or holidays.

¶ 22 Natalie Fowler, a caseworker at CYFS, testified that she has held that position since June 2024 and has served as the caseworker in this case since August of the same year. Her job entails providing services to the parents, communicating with them about progress, supervising parental visits, and completing the service plan reports. Her testimony was generally consistent with that of Cavanaugh. Respondent completed her parenting class in March 2025 and has maintained housing since November 2024. However, she did not complete substance abuse treatment and has not provided proof that she completed domestic violence courses or her MRT course. She has had sporadic employment. She has communicated minimally about her progress and has been hard to reach due to changing phone numbers. Furthermore, she has not completed her initial sex offender assessment, and she has not consistently completed the drug testing. Moreover, she has not expressed interest in the children, such as inquiring about their interests or how to restart parental visits. She did not send gifts or cards to her children on birthdays or holidays, but she did get beds for them at her apartment.

¶ 23 Respondent did not testify and did not submit any exhibits.

¶ 24       The trial court took judicial notice of the prior permanency reports not entered into evidence, but only with respect to the drug test results. These results showed that respondent missed 21 of the 35 drug tests during the nine-month time frame. They also showed that during the drug overdose incident, respondent had the following controlled substances in her blood: amphetamines, barbiturates, benzodiazepines, buprenorphine, cocaine, methamphetamines, methadone, opiates, oxycodone, phencyclidine, cannabinoids, and tricyclic antidepressants.

¶ 25       After hearing arguments from each party, the trial court found that

"the State has proven, by clear and convincing evidence, as to each parent, that each parent has failed to maintain a reasonable degree of interest, concern or responsibility and failed to make reasonable efforts or progress during the requisite timeframe.

*** If this was a situation where the parents were doing everything in their power to make progress on their service plan and the only thing preventing them from making progress was wait list [sic], we wouldn't be here; and each of the parents knows that that is true. There was clear, uncontroverted evidence that during the timeframes we're looking at here, multiple referrals were made for these services. Parents were not following through. The parents were no-showing. The parents were getting repeated opportunities at different services and were not doing what they needed on their end to even get started.

* * *

Even simpler, as far as the evidence presented today is [sic] Count 1, and neither parent has really even made an attempt to present evidence to contradict the State's evidence as far as a lack of reasonable interest, concern, or responsibility.

Visitation was suspended over a year ago in this case; and since that time, the uncontradicted evidence is that you haven't even been asking the caseworker how your children are doing."

¶ 26                                D. Best-Interest Hearing

¶ 27        In December 2025, the hearing on the best interest of the children commenced, after which the trial court determined that it was in the children's best interest for respondent's parental rights to be terminated. It then entered an order of termination.

¶ 28        This appeal followed.

¶ 29                                II. ANALYSIS

¶ 30        On appeal, respondent argues that the trial court erred in finding that the State proved her unfit by clear and convincing evidence. Specifically, she challenges the three separate and independent grounds articulated by the court for the finding of unfitness: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that caused the minors to be removed between March 18, 2024, and December 18, 2024, and between March 31, 2024, and December 31, 2024 (750 ILCS 50/1(m)(i) (West 2024)); and (3) failure to make reasonable progress during the same nine-month periods (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 31        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because its " 'opportunity to view and evaluate the parties *** is superior to that of a reviewing court.' " *In re M.I.*, 2016 IL 120232, ¶ 21 (quoting *In re Brown*, 86 Ill. 2d 147, 152 (1981)). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL

121939, ¶ 29. A decision is against the manifest weight of the evidence only when "the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence." *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 89.

¶ 32 The trial court's judgment can be affirmed on any one of the independent grounds supporting the finding of unfitness. *In re D.F.*, 201 Ill. 2d 476, 505 (2002). Here, we assess whether the court's judgment can be supported by respondent's failure to "to make reasonable progress toward the return of the child to the parent" under section 1(D)(m)(ii) (750 ILCS 50/1(D)(m)(ii) (West 2024)). Whether respondent failed to make reasonable progress is an objective test when a service plan is in place. *In re B.W.*, 282 Ill. App. 3d 680, 683 (1996).

¶ 33 The record shows that a service plan was in place and that respondent has not completed, or even started, several of its required goals, including a sex offender evaluation, a substance abuse treatment program, routine drug testing, and a domestic violence course. The parenting course was not completed until after the nine-month periods had passed. Respondent argues that she partially completed services, such as attending visitation with her children until it was suspended; taking some drug tests, none of which came back positive for substances other than THC; and securing stable housing in November 2024. However, a trial court can fairly reach an unfitness determination when the service plan items are not completed in full. See *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (emphasizing that reasonable progress can be shown when the parent has *fully* complied with the court's directives and the court can conclude the minor can be returned to the parent in the *near* future) (citing *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)).

¶ 34 Respondent argues that her lack of a driver's license made attending services infeasible. However, "a parent can be unfit without fault," and the parent's personal circumstances have limited relevance in the objective analysis of whether reasonable progress occurred. *In re*

*A.M.*, 2025 IL App (1st) 250467, ¶ 52 (affirming finding of unfitness based on section 1(D)(m) despite the parent's cognitive disability). Even if the lack of driver's license endured throughout the nine-month periods, respondent's occasional attendance indicates that she had *some* ability to travel. Nevertheless, she failed to complete even the *initial* sex offender evaluation.

¶ 35 Furthermore, several other shortcomings seem to have no connection to her ability to drive. For example, she overdosed during the nine-month periods; questioned whether she needed the sex-offender assessment; and willingly decided not to enroll in a domestic violence course on one occasion. She moved in with the children's biological father, who was also deemed unfit. He reportedly overdosed during the nine-month periods, and respondent had domestic violence issues in relation to him. See *Id.* ¶ 43 (affirming unfitness finding under section 1(D)(m) as to the respondent mother due to choosing to remain in relationship with the abusive father).

¶ 36 The record indicates that during the nine-month periods, respondent failed to demonstrate reasonable progress in completing the goals in the service plan. We cannot say the trial court's judgment was against the manifest weight of the evidence.

¶ 37 III. CONCLUSION

¶ 38 For the reasons stated, we affirm the trial court's judgment.

¶ 39 Affirmed.